**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SANFORD BISMARCK D/B/A SANFORD BISMARCK MEDICAL CENTER<br>300 North Seventh Street, Bismarck, North Dakota 58501-4439 | ) ) ) ) |
| SANFORD MEDICAL CENTER FARGO<br>801 Broadway North; Fargo, North Dakota 58122-0001 | ) ) ) ) |
| UNIVERSITY OF ROCHESTER<br>601 Elmwood Avenue; Rochester, New York 14642 | ) ) ) ) |
| HIGHLAND HOSPITAL OF ROCHESTER D/B/A HIGHLAND HOSPITAL<br>1000 South Avenue; Rochester, New York 14620 | ) ) ) ) ) |
| GLENS FALLS HOSPITAL<br>100 Park Street; Glen Falls, New York 12801-9898 | ) ) ) ) |
| THE SARATOGA HOSPITAL<br>211 Church Street; Saratoga Springs, New York 12866 | ) ) ) ) |
| MCALLEN HOSPITALS, L.P. D/B/A SOUTH TEXAS HEALTHCARE SYSTEM<br>1102 West Trenton Road; Edinburg, Texas 78539 | ) ) ) ) ) |
| NORTHWEST TEXAS HEALTHCARE SYSTEM, INC.<br>1501 South Coulter Street; Amarillo, Texas 79106 | ) ) ) ) ) |
| ST. BARNABAS HOSPITAL<br>4422 Third Avenue; Bronx, New York 10457 | ) ) ) |
| THE TOLEDO HOSPITAL<br>2142 N. Cove Blvd; Toledo, Ohio 43606 | ) ) ) ) ) |

Civil Action No. _____

CUMBERLAND COUNTY HOSPITAL               )
SYSTEM, INC. D/B/A CAPE FEAR             )
VALLEY MEDICAL CENTER                    )
1638 Owen Drive; Fayetteville, North     )
Carolina 28304                           )
                                         )
GEISINGER WYOMING VALLEY                 )
MEDICAL CENTER                           )
1000 East Mountain Boulevard; Wilkes-Barre, )
Pennsylvania 18510                       )
                                         )
COMMUNITY MEDICAL CENTER D/B/A           )
GEISINGER – COMMUNITY MEDICAL            )
CENTER                                   )
1800 Mulberry Street; Scranton, Pennsylvania )
18510                                    )
                                         )
ALBANY MEDICAL CENTER HOSPITAL           )
43 New Scotland Avenue; Albany, New York )
12208                                    )
                                         )
SOUTHWEST LOUISIANA HOSPITAL             )
ASSOCIATION D/B/A LAKE CHARLES           )
MEMORIAL HOSPITAL                        )
1701 Oak Park Boulevard; Lake Charles,   )
Louisiana 70601                          )
                                         )
MONTEFIORE MEDICAL CENTER                )
111 East 210th Street; Bronx, New York 10467 )
                                         )
MONTEFIORE NEW ROCHELLE                  )
HOSPITAL                                 )
16 Guion Place; New Rochelle, New York   )
10801                                    )
                                         )
WHITE PLAINS HOSPITAL MEDICAL            )
CENTER                                   )
41 East Post Road and Davis Avenue; White )
Plains, New York 10601-4607              )
                                         )
            Plaintiffs,                  )
        v.                               )
                                         )
                                         )
XAVIER BECERRA, in his official capacity )
as Secretary, United States Department of )
Health and Human Services,               )

2

200 Independence Ave. S.W.                    )
Washington, District of Columbia 20201,       )
                                              )
        Defendant.                            )
                                              )

## COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY ACTION AND FOR SUMS DUE UNDER THE MEDICARE ACT

Plaintiffs, Sanford Bismarck d/b/a Sanford Bismarck Medical Center ("Sanford Bismarck Medical Center"); Sanford Medical Center Fargo ("Sanford Medical Center — Fargo"); University of Rochester ("Strong Memorial Hospital"); Highland Hospital of Rochester d/b/a Highland Hospital ("Highland Hospital"); Glens Falls Hospital; The Saratoga Hospital ("Saratoga Hospital"); McAllen Hospitals, L.P. d/b/a South Texas Healthcare System ("South Texas Healthcare System"); Northwest Texas Healthcare System, Inc. ("Northwest Texas Healthcare System"); St. Barnabas Hospital; The Toledo Hospital ("Toledo Hospital"); Cumberland County Hospital System, Inc. d/b/a Cape Fear Valley Medical Center ("Cape Fear Valley Medical Center"); Geisinger Wyoming Valley Medical Center; Community Medical Center d/b/a Geisinger – Community Medical Center ("Geisinger – Community Medical Center"); Albany Medical Center Hospital ("Albany Medical Center"); Southwest Louisiana Hospital Association d/b/a Lake Charles Memorial Hospital ("Lake Charles Memorial Hospital"); Montefiore Medical Center; Montefiore New Rochelle Hospital; and White Plains Hospital Medical Center (collectively "Plaintiffs") bring this Complaint for Judicial Review against Defendant Xavier Becerra, in his official capacity as Secretary of Health and Human Services ("HHS"), and allege as follows:

## I.    INTRODUCTION AND NATURE OF SUIT

1.    The Secretary of Health and Human Services (the "Secretary") is required by statute to prospectively pay hospitals for capital-related expenses. In this instance, the Secretary has created

a policy that irrationally results in underpayments to hospitals such as the Plaintiffs for these expenses.

2.      The Medicare Statute (42 U.S.C. § 1395a *et seq.*) provides for payments for two types of hospital costs on a prospective payment basis, specifically, operating costs and capital costs.

3.      Since the inception of the capital cost prospective payment system in 1991, the Secretary has tied his capital cost prospective payment system methodology to data regarding actual hospital capital costs, with one exception. In a final rule issued in 2006, the Secretary promulgated a regulation that reduced reimbursement for capital costs for a certain group of hospitals for reasons that had no relation to their costs.

4.      Specifically, these hospitals had elected to acquire "rural" status solely for purposes of the operating cost prospective payment methodology. The criteria for achieving rural status are unrelated to being in, or near, a rural area, and do not reflect a physically rural hospital's cost structure. Indeed, there are even hospitals in New York City that have elected to obtain rural status, as permitted by the applicable *operating* cost prospective payment statutory provision. No similar provision exists within the *capital* cost prospective payment statute. Nor is there any cross-reference to the operating cost prospective payment statutory provision.

5.      In short, there is no statutory authority that allows the Secretary to use a hospital's election established under the operating prospective payment system, which is unrelated to cost, to reduce a hospital's reimbursement under the capital prospective payment system.

6.      For all of the years appealed by the Plaintiffs in this matter, the Secretary, through his Medicare Contractors, disallowed a portion of Plaintiffs' claims to reimbursed capital costs because of Plaintiffs' "acquired" rural status.

7.      Plaintiffs filed appeals with the Secretary's Provider Reimbursement Review Board (the "Board") challenging the final determinations of their capital cost claims. On October 17, 2022, Plaintiffs Sanford Bismarck Medical Center, Sanford Medical Center – Fargo, Strong Memorial Hospital, Highland Hospital, Glens Falls Hospital, Saratoga Hospital, South Texas Healthcare System, Northwest Texas Healthcare System, St. Barnabas Hospital, Toledo Hospital, Cape Fear Valley Medical Center, Geisinger Wyoming Valley Medical Center, Geisinger – Community Medical Center, and Albany Medical Center filed requests for expedited judicial review. On December 1, 2022, Plaintiffs Lake Charles Memorial Hospital, Montefiore Medical Center, Montefiore New Rochelle Hospital, and White Plains Hospital Medical Center filed requests for expedited judicial review. Expedited judicial review is available to these Plaintiffs because the Plaintiffs are challenging the Secretary's regulation, which cannot be overturned by the Board.

8.      The Board approved the Plaintiffs' requests for expedited judicial review in a series of decisions issued between November 15, 2022 and December 15, 2022. Plaintiffs now file this action for sums due under the Medicare Act, and for judicial review under the Medicare Act and the Administrative Procedure Act of the Secretary's final determinations of payment for Plaintiffs' capital costs.

## II.      PARTIES

9.      Plaintiff Sanford Bismarck Medical Center is a hospital located in Bismarck, North Dakota that participates in the Medicare program (provider number 35-0015). Sanford Bismarck Medical Center challenges the Medicare program's determination of its capital disproportionate share hospital ("DSH") payment for fiscal years 2016 and 2017.

10.     Plaintiff Sanford Medical Center – Fargo is a hospital located in Fargo, North Dakota that participates in the Medicare program (provider number 35-0011).  Sanford Medical Center – Fargo

challenges the Medicare program's determination of its capital DSH payment for fiscal years 2016 and 2017.

11.    Plaintiff Strong Memorial Hospital is a hospital located in Rochester, New York that participates in the Medicare program (provider number 33-0285). Strong Memorial Hospital challenges the Medicare program's determination of its capital DSH payment for fiscal years 2016, 2017, and 2018.

12.    Plaintiff Highland Hospital is a hospital located in Rochester, New York that participates in the Medicare program (provider number 33-0164). Highland Hospital challenges the Medicare program's determination of its capital DSH payment for fiscal years 2016, 2017, and 2018.

13.    Plaintiff Glens Falls Hospital is a hospital located in Glens Falls, New York that participates in the Medicare program (provider number 33-0191). Glens Falls Hospital challenges the Medicare program's determination of its capital DSH payment for fiscal years 2017 and 2018.

14.    Plaintiff Saratoga Hospital is a hospital located in Saratoga Springs, New York that participates in the Medicare program (provider number 33-0222). Saratoga Hospital challenges the Medicare program's determination of its capital DSH payment for fiscal years 2017 and 2018.

15.    Plaintiff South Texas Healthcare System is a hospital located in Edinburg, Texas that participates in the Medicare program (provider number 45-0119). South Texas Healthcare System challenges the Medicare program's determination of its capital DSH payment for fiscal years 2016 and 2017.

16.    Plaintiff Northwest Texas Healthcare System is a hospital located in Amarillo, Texas that participates in the Medicare program (provider number 45-0209). Northwest Texas Healthcare System challenges the Medicare program's determination of its capital DSH payment for fiscal years 2016 and 2017.

17.    Plaintiff St. Barnabas Hospital is a hospital located in the Bronx, New York that participates in the Medicare program (provider number 33-0399). St. Barnabas Hospital challenges the Medicare program's determination of its capital DSH payment for fiscal year 2017.

18.    Plaintiff Toledo Hospital is a hospital located in Toledo, Ohio that participates in the Medicare program (provider number 36-0068). Toledo Hospital challenges the Medicare program's determination of its capital DSH payment for fiscal year 2017.

19.    Plaintiff Cape Fear Valley Medical Center is a hospital located in Fayetteville, North Carolina that participates in the Medicare program (provider number 34-0028). Cape Fear Valley Medical Center challenges the Medicare program's determination of its capital DSH payment for fiscal years 2016 and 2017.

20.    Plaintiff Geisinger Wyoming Valley Medical Center is a hospital located in Wilkes-Barre, Pennsylvania that participates in the Medicare program (provider number 39-0270). Geisinger Wyoming Valley Medical Center challenges the Medicare program's determination of its capital DSH payment for fiscal year 2018.

21.    Plaintiff Geisinger – Community Medical Center is a hospital located in Scranton, Pennsylvania that participates in the Medicare program (provider number 39-0001). Geisinger – Community Medical Center challenges the Medicare program's determination of its capital DSH payment for fiscal year 2018.

22.    Plaintiff Albany Medical Center is a hospital located in Albany, New York that participates in the Medicare program (provider number 33-0013). Albany Medical Center challenges the Medicare program's determination of its capital DSH payment for fiscal year 2018.

23.    Plaintiff Lake Charles Memorial Hospital is a hospital located in Lake Charles, Louisiana that participates in the Medicare program (provider number 19-0060). Lake Charles Memorial

Hospital challenges the Medicare program's determination of its capital DSH payment for fiscal years 2017 and 2018.

24.    Plaintiff Montefiore Medical Center is a hospital located in the Bronx, New York that participates in the Medicare program (provider number 33-0059). Montefiore Medical Center challenges the Medicare program's determination of its capital DSH payment for fiscal years 2016 and 2017.

25.    Plaintiff Montefiore New Rochelle Hospital is a hospital located in New Rochelle, New York that participates in the Medicare program (provider number 33-0184). Montefiore New Rochelle Hospital challenges the Medicare program's determination of its capital DSH payment for fiscal year 2017.

26.    Plaintiff White Plains Hospital Medical Center is a hospital located in White Plains, New York that participates in the Medicare program (provider number 33-0304). White Plains Hospital Medical Center challenges the Medicare program's determination of its capital DSH payment for fiscal year 2017.

27.    Defendant Xavier Becerra (the "Secretary") is the Secretary of the United States Department of Health & Human Services ("HHS"), the federal agency that, through the Centers for Medicare & Medicaid Services ("CMS"), administers the Medicare program. References to the Secretary herein are meant to refer to him, his subordinate agencies and officials, and to his official predecessors or successors as the context requires.

## III.    JURISDICTION AND VENUE

28.    This Court possesses subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Medicare Act, title XVIII of the Social Security Act ("SSA"), 42 U.S.C. §§ 1395 et seq., and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 et seq.

29.    Jurisdiction is proper under 42 U.S.C. §§ 1395oo(a)(1)(A)(i) and 1395oo(f)(1).

30.     Venue is proper in this judicial district under 42 U.S.C. § 1395oo(f)(1).

31.     Plaintiffs timely seek judicial review of a final agency decision for which no further administrative review is available, and Plaintiffs have exhausted their administrative remedies.

32.     Plaintiffs possess statutory standing under 5 U.S.C. § 702, Article III standing, and are within the relevant zone of interests protected by the Medicare statute because Plaintiffs are aggrieved by the final decision of the Secretary and have suffered cognizable legal injury.

## IV.     **PROCEEDINGS BELOW**

33.     Each plaintiff hospital received a final determination of reimbursement issued by their respective Medicare Administrative Contractors ("Medicare Contractors") for each of the cost reporting periods at issue. Each final determination indicated that each plaintiff hospital did not qualify for a portion of its capital cost prospective payment system claim because of its "acquired" rural status under the operating prospective payment system. Specifically, the Secretary does not allow hospitals with "acquired" rural status to receive capital cost-related payments in connection with its "disproportionate share hospital," or "DSH", status. DSH status is an indicator that a hospital is a safety net hospital.

34.     Each plaintiff hospital timely requested a hearing before the Board to appeal the DSH disallowance.

35.     On October 17, 2022, plaintiff hospitals Sanford Bismarck Medical Center, Sanford Medical Center – Fargo, Strong Memorial Hospital, Highland Hospital, Glens Falls Hospital, Saratoga Hospital, South Texas Healthcare System, Northwest Texas Healthcare System, St. Barnabas Hospital, Toledo Hospital, Cape Fear Valley Medical Center, Geisinger Wyoming Valley Medical Center, Geisinger – Community Medical Center, and Albany Medical Center requested from the Board expedited judicial review ("EJR"), pursuant to 42 C.F.R. § 405.1842.

36.     On November 15–16, 2022, the Board granted the EJR requests of plaintiff hospitals Sanford Bismarck Medical Center, Sanford Medical Center – Fargo, Strong Memorial Hospital, Highland Hospital, Glens Falls Hospital, Saratoga Hospital, South Texas Healthcare System, Northwest Texas Healthcare System, Geisinger Wyoming Valley Medical Center, Geisinger – Community Medical Center, and Albany Medical Center.

37.     On December 7, 2022, the Board granted the EJR requests of plaintiff hospitals St. Barnabas Hospital, Toledo Hospital, and Cape Fear Valley Medical Center.  However, as to St. Barnabas Hospital, the Board found that the hospital had not filed "an appropriate claim for the specific item" in dispute, as required under 42 C.F.R. § 413.24(j)(1).  The Board, however granted the Plaintiffs' EJR request to challenge the validity of 42 C.F.R. §§ 413.24(j) and 405.1873.

38.     On December 1, 2022, plaintiff hospitals Lake Charles Memorial Hospital, Montefiore Medical Center, Montefiore New Rochelle Hospital, and White Plains Hospital Medical Center requested from the Board EJR, pursuant to 42 C.F.R. § 405.1842.

39.     On December 15, 2022, the Board granted the EJR requests of plaintiff hospitals Lake Charles Memorial Hospital, Montefiore Medical Center, Montefiore New Rochelle Hospital, and White Plains Hospital Medical Center.

40.     Plaintiffs are timely commencing this action within 60 days of the Board's initial November 15, 2022 determination, pursuant to 42 U.S.C. § 1395oo(f)(1).

**V.     APPLICABLE LAW**

41.     The Federal Medicare program provides health insurance to the aged, blind and disabled under title XVIII of the Social Security Act.

42.     Medicare Part A covers, in large part, hospital services furnished to inpatients. *See* 42 U.S.C. § 1395d(a)(1).

43.    Medicare pays hospitals for inpatient services through a per-discharge payment that is based on a patient's diagnosis, referred to as a diagnosis-related group ("DRG"). 42 U.S.C. §§ 1395ww(d) and (g); 42 C.F.R. § 412.1(a)(1).

## A.    Background of Prospective Payment Systems

44.    When Medicare was first enacted, hospitals were reimbursed on a cost basis. 42 U.S.C. § 1395x(v)(1)(A); *see also* S. Guterman & A. Dobson, Impact of the Medicare Prospective Payment System for Hospitals, 7 HEALTH CARE FINANCE REVIEW 3 at 97-114 (Spring 1986) (discussing the history of the Medicare hospital reimbursement system prior to the Social Security Amendments of 1983).

45.    Costs were accrued over the course of a "cost reporting year" and reported on a "cost report" which in turn was audited by CMS and its contractors and reconciled to interim payments.

46.    Over time, however, it was recognized that costs could be better contained if hospitals were paid for their costs prospectively, based on the expected costs associated with the diagnosis of the patient treated, rather than the hospital's retrospective calculation of their reasonable costs for the year.

47.    Thus, Congress, through a series of legislative changes, phased in a prospective payment system for hospital inpatient costs.

48.    Congress first required the Medicare program to implement a prospective payment system for operating costs in 1983. Social Security Amendments of 1983, Pub. L. No. 98-21 § 601; 42 U.S.C. § 1395ww(d)(1). At its most fundamental level, this system entails payment for operating costs based on the expected costs of treating patients with a particular diagnosis. 42 U.S.C. § 1395ww(b)(2).

49.    Each type of diagnosis falls within a DRG that is associated with a specific weighting. 42 U.S.C. § 1395ww(d)(4). The weighting is multiplied by a "standardized amount" to result in

the payment for that particular admission. 42 U.S.C. § 1395ww(d)(3)(A). The standardized amount is in turn comprised of two components: (a) a labor-related portion; and (b) a non-labor-related portion. 42 U.S.C. § 1395ww(d)(3)(E). The labor-related portion is multiplied by a labor factor, called the "wage index," which varies based on the geographic area where the hospital is situated. *Id.*

50.    To accomplish the relative wage-level adjustment, the Secretary calculates and assigns a wage index value to each wage area that reflects the relative hospital wage levels of that area to all geographic areas. 42 C.F.R. § 412.64(h). Each State has multiple "urban areas," and most have one "rural area." 42 U.S.C. § 1395ww(d)(2)(D) (defining "urban" and "rural" for purposes of the inpatient payment); 42 C.F.R. § 412.64(b).

51.    The Secretary defines "urban area" as "[a] Metropolitan Statistical Area . . ., as defined by the Executive Office of Management and Budget."  42 C.F.R. § 412.64(b)(1)(ii).

52.    The Secretary defines "rural area" as "any area outside an urban area." 42 C.F.R. § 412.64(b)(1)(ii)(C).

53.    Besides the costs associated with labor and the severity of a patient's diagnosis, Congress also recognized several other factors that could increase a hospital's operating costs, including status as a safety net hospital or a teaching hospital.

54.    Congress therefore implemented payment adjustments to account for these costs, including DSH adjustments to aid safety net hospitals (Social Security Amendments of 1983, Pub. L. No. 98-21 § 601; 42 U.S.C. § 1395ww(d)(5)(D)) as well as an indirect medical education adjustment for teaching hospitals (Social Security Amendments of 1983, Pub. L. No. 98-21 § 601; 42 U.S.C. § 1395ww(d)(5)(B)). Initially, capital costs remained paid on a reasonable cost basis.  56 Fed. Reg.

43358, 43358 (Aug. 30, 1991) (noting that prior to 1991, "hospital inpatient operating costs were the only costs covered under the prospective payment system.").

**B.    Reclassifications**

55.    Following the implementation of the prospective payment system, Congress determined that some hospitals needed a mechanism by which to petition the Secretary for modifications to the portion of their reimbursement associated with their physical location. Some hospitals' cost structures resembled the cost structures of hospitals in neighboring areas more than the cost structures of hospitals within their own area, meaning that payment equity required an exceptions process.

56.    Congress therefore allowed, as of 1991, hospitals to "reclassify" to a neighboring geographic area, such that they can obtain that area's wage index, which would have expenses more commensurate with the reclassifying hospital's expenses. Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239 § 6003(h)(1); 42 U.S.C. § 1395ww(d)(10).

57.    Initially, the Secretary allowed two different forms of reclassifications. The standardized amount at the time differed depending upon whether a hospital was in a rural area or an urban area. 42 U.S.C. § 1395ww(d)(3)(A)(ii).

58.    Accordingly, the Secretary created one pathway to allow rural hospitals to reclassify as urban for purposes of obtaining the urban standardized amount. 55 Fed. Reg. 36754, 36755 (Sept. 6, 1990). This required a showing of the hospital's high total costs per discharge. 42 C.F.R. § 412.230(d)(1) (1991).

59.    The second type of reclassification allowed a hospital to obtain the wage index of a neighboring area. 55 Fed. Reg. at 36755. Qualification for this reclassification required only a showing of high wage costs for the applicant hospital. 42 C.F.R. § 412.230(e)(i) (1991).

60.    The urban and rural standardized rates were equalized under the Medicare Prescription Drug, Improvement and Modernization Act of 2003; Pub. L. No. 108-173 § 401. Accordingly, the Secretary removed the standardized amount reclassification provisions. 69 Fed. Reg. 48915, 49103 (Aug. 11, 2004); compare 42 C.F.R. §§ 412.230(a)(1)(i) and (a)(1)(ii) (pre- and post-2005 reclassification purposes). Only wage index reclassifications remain.

## C.    Implementation of Capital Cost PPS

61.    Once the operating expense prospective payment was completed, Congress then required that the Medicare program develop a "prospective payment system" for "capital-related costs of inpatient hospital services" effective as of October 1, 1991. Omnibus Budget Reconciliation Act of 1987, Pub. L. No. 100-203 § 4006(b)(1); 42 U.S.C. § 1395ww(g).

62.    The Secretary was required specifically to pay on a "per discharge basis" based on a "weighting" appropriate for "the classification of [each such] discharge." 42 U.S.C. § 1395ww(g)(1)(B)(i); *see also* H.R. Rep. No. 100-495 at 534 (1987) (describing Congress's directive to establish a capital-related cost prospective payment system).

63.    In other words, capital costs would now be determined prospectively based on the anticipated cost per discharge, rather than retrospectively at the end of a cost reporting year.

64.    While they may appear similar, the operating cost prospective payment system and the capital cost prospective payment system are separate. These prospective payment systems are covered by separate statutory provisions (42 U.S.C. § 1395ww(d) and 1395ww(g), respectively). Importantly, 42 U.S.C. § 1395ww(g) does not cross-reference 42 U.S.C. § 1395ww(d).

65.    The capital prospective payment system provision includes two permissive adjustments and one exception process, each of which reflects cases where cost anomalies may need to be addressed by the Secretary.

66.     The first adjustment permits the Secretary to take into account variations in the relative costs of capital and construction for the different types of facilities or areas in which they are located (variations in local cost). 42 U.S.C. § 1395ww(g)(1)(B)(ii).

67.     The second adjustment permits the Secretary to take into account variations in hospital occupancy rate. 42 U.S.C. § 1395ww(g)(1)(B)(iv).

68.     The exception process permits the Secretary to grant exceptions, including appropriate exceptions to reflect existing capital obligations. 42 U.S.C. § 1395ww(g)(1)(B)(iii).

69.     The Secretary implemented this statute in regulation. The key features of the regulatory scheme were all supported by cost analyses.

70.     The Secretary initially concluded that there was "wide variation in capital costs per case" experienced by various hospitals. 56 Fed. Reg. 43358, 43363 (Aug. 30, 1991).

71.     Consequently, the Secretary conducted a comprehensive regression analysis to evaluate the relationship between historic capital costs and certain types of hospital groups. *Id.* at 43369-82.

72.     The Secretary's cost analysis focused on several specific circumstances including:

    a)  Teaching hospitals;

    b)  Hospitals with a higher number of low income patients;

    c)  Hospitals in an urban setting;

    d)  Hospitals in a large urban setting; and

    e)  Hospitals in a rural setting.

*Id.*

73.     Having concluded that some of these characteristics were predictive of capital costs, the Secretary created certain capital cost payment adjustments that mirrored certain parallel operating cost adjustments. *Id.* at 43369-70 (noting that the Secretary has "latitude to develop adjustments

based on combined costs for the capital prospective payment system."). Specifically, the Secretary created an indirect teaching adjustment for teaching hospitals and a DSH adjustment for safety net hospitals. *Id.* at 43452-53.

74.    The regulation and initial rulemaking also address all of the instances of the Secretary's discretionary authority to make modifications to its general rule.

75.    The Secretary properly understood that each such exception needed to be interpreted in terms of reflecting a modification that would be narrowly tailored to specific cost anomalies. As a result, the Secretary opted to create:

  a) Adjustments for local cost variations through the geographic adjustment factor. 42 C.F.R § 412.316 (reflecting the permissive authority of 42 U.S.C. § 1395ww(g)(1)(B)(ii) to take into account the relative costs of capital and construction in various geographic marketplaces); 56 Fed. Reg. at 43374; and

  b) Exception payments for hospitals meeting certain specified criteria. 42 C.F.R. § 412.348 (reflecting the permissive authority of 42 U.S.C. § 1395ww(g)(1)(B)(iii) to grant exceptions in cases determined appropriate by the Secretary).

76.    Although the Secretary recognized his discretionary ability to create an adjustment for hospital occupancy levels, he determined that such an adjustment did not bear a sufficient relationship to costs and therefore declined to create such an adjustment. *Id.* at 43411-12.

77.    These regulations demonstrate that the Secretary has already considered, and engaged in explicit rulemaking about, the additional criteria for which he has discretion under § 1395ww(g). There are no other authorities that provide for some sort of miscellaneous adjustments in the Secretary's sole discretion that are somehow removed from cost considerations.

**D.      The Capital DSH Adjustment**

78.      As previously stated, one of the hospital categories whose cost data merited special treatment are safety net hospitals. For these hospitals, the Secretary created the capital DSH payment mechanism, 42 C.F.R. § 412.320(b)(1); *see also* 56 Fed. Reg. at 43377-79.

79.      The Secretary performed a regression analysis to determine the proper amount to pay these hospitals to compensate them for their capital costs through the DSH payment mechanism. 56 Fed. Reg. at 43369-82.

80.      Notably, this regression analysis indicated that safety net hospitals in rural areas did not incur higher capital costs, and therefore the Secretary determined not to make higher payments to them. *Id*. at 43377. Unlike now, all rural hospitals were hospitals physically located in the rural area at the time this regulation was promulgated.

81.      The initial capital cost prospective payment rulemaking also addressed how to treat hospitals that have undergone a geographic reclassification for operating cost prospective payment system purposes. The Secretary distinguished between the two types of reclassifications noted above (i.e., "standardized amount" reclassifications and "wage index" reclassifications) and their impact on capital DSH as follows:

> Any hospital that is reclassified to an urban area by the [Medicare Geographic Classification Review Board ("MGCRB")] for purposes of its standardized amount is considered to be urban for all prospective payment purposes other than the wage index. As such, if any hospital reclassified by the MGCRB to an urban area for purposes of the standardized amount has at least 100 beds, it would be eligible for capital disproportionate share payments. We note that a rural hospital reclassified for purposes of the wage index only is still considered a rural hospital, and as such, will not be eligible for capital disproportionate share payments.

*Id.* at 43379.

82.    As previously discussed, the "standardized amount" reclassifications required a more comprehensive demonstration of higher total costs, as compared with the more limited wage data necessary to qualify for a "wage index" reclassification.

83.    Therefore, the Secretary allowed only the standardized amount reclassification to result in a higher capital DSH payment. The latter, with only high wage costs presented, would not generally have been able to show that their costs were comparable to urban hospitals, and therefore capital DSH payment would not be warranted. Thus, as with every other consideration of geographic adjustments to the capital cost prospective payment system, the cost element generated the policy decision. Such consideration tracks the governing statute, 42. U.S.C. § 1395ww(g)(1)(B)(ii), which allows the Secretary to make "adjustment[s] to take into account variations in the relative costs of capital . . . for the different types of facilities."

**E.    Rural Reclassification**

84.    Separately, in 1999, Congress created a pathway for hospitals to assume "rural" status for purposes of the operating prospective payment system. Medicare, Medicaid and SCHIP Balanced Budget Refinement Act of 1999, Pub. L. No. 106-113 § 401 (1999); 42 U.S.C. § 1395ww(d)(8)(E).

85.    To qualify for rural status, all a hospital need show is that it could otherwise have qualified as a rural referral center ("RRC") or a sole community hospital ("SCH") but for its location in an urban area. 42 U.S.C. § 1395ww(d)(8)(E)(ii)(III).

86.    The manifest intent of the statute was to allow hospitals that were close to meeting the requirements of RRC or SCH status, but for their location in an urban area, to be able to overcome that last requirement by making the election to become rural. Indeed, in the Secretary's Federal Register preamble implementing this statute, it specifically laid out the two-step approach towards obtaining RRC or SCH status for an urban hospital following this pathway. 65 Fed. Reg. 47026, 47030-31 (Aug. 1, 2000).

87.     Generally speaking, it is not desirable to be a "rural" hospital because some portion of the prospective payment is based on the hospital's wage index, which is based on the costs of labor in the hospital's geographic area. 42 C.F.R. § 412.64(h) (operating payment) and 42 C.F.R. § 412.316 (capital payment). Geographically rural hospitals generally have lower costs of labor, meaning that their wage indexes are lower than urban areas.

88.     However, SCHs are entitled to favorable reimbursement status. 42 C.F.R. § 412.92(d). Previously, RRCs had favorable reimbursement status as well. 42 C.F.R. § 412.96(e) (for discharges prior to FY 1995, RRCs were paid at an urban, instead of rural, rate for their standardized amount). RRCs and SCHs also continue to have favorable status for reclassification purposes, which allows them to waive certain proximity and wage index requirements. 42 C.F.R. §§ 412.230(a)(3) and (d)(3).

89.     Becoming an "acquired" rural status hospital under this pathway has no connection to either: (a) the hospital's actual geographic location; or (b) the hospital's cost structure.

90.     There are, for instance, hospitals in New York City that have "acquired" rural status, such as Lenox Hill Hospital and the Hospital for Special Surgery.  *See* 84 Fed. Reg. 42044, 42679 (Aug. 16, 2019) (referencing the FY 2020 Proposed Rule Impact File, available on the CMS.gov website at the "FY2020 IPPS Final Rule Home Page"). From a cost structure, it is clear that their costs are like (if not significantly in excess of) any other urban hospital's cost.

91.     A typical physically rural hospital in New York would be Adirondack Medical Center, which is located in Franklin County and serves a population of 51,599 county residents with a bed complement of 83. Yet both it and reclassified hospitals in New York City are deemed "rural" for certain operating cost prospective payment purposes. The term "rural" is therefore simply a

categorization of a type of hospital, and not any indication of whether the hospital's cost structure is like a hospital that is truly "rural" as a layperson would understand that term.

**F.    The Secretary's 2006 Capital DSH Rule**

92.    Although initially the Secretary properly understood that the purpose of the capital PPS payment was to determine prospectively a hospital's expected per-discharge capital costs and pay accordingly, the Secretary subsequently veered away from the statute's dictates.

93.    In 2006, the Secretary promulgated the regulation at issue here, 42 C.F.R. § 412.320(a)(1)(iii), which sets forth that "for an urban hospital that is reclassified as rural as set forth in §412.103, the geographic classification is rural."

94.    The Secretary claims in the implementing Federal Register that his rationale for this policy is as follows:

> These changes were proposed to reflect our historic policy that hospitals reclassified as rural under § 412.103 also are considered rural under the capital PPS. Since the genesis of the capital PPS in FY 1992, the same geographic classifications used under the operating PPS also have been used under the capital PPS.

 71 Fed. Reg. 47870, 48104 (Aug. 18, 2006).

The Secretary's statements, however, lack any grounding in actual fact.

95.    The only instances in which the Secretary addressed capital DSH and geographic locations were in 1991 and 2004.  In 1991, the Secretary actually distinguished between reclassifications for standardized amount and those for wage index.  Only the former were accepted for determining an adjustment to capital cost prospective payments.  56 Fed. Reg. at 43379.  To achieve a standardized amount reclassification required a showing of higher total costs, as compared with the other hospitals in the reclassifying hospital's geographic area.  42 C.F.R. § 412.230(d).

96.    Moreover, in 2004, the Secretary stated that he would no longer take into account *any* hospital reclassifications for receipt of certain special capital payments.  At that time, the Secretary

stated that a hospital must be physically located in an urban, or large urban, area to obtain the capital cost payment benefits associated with those areas. 69 Fed. Reg. 48916, 49187 (Aug. 11, 2004) (promulgating a revised regulation at 42 C.F.R. § 412.320(a)).

97.    As to whether it had actually been the Secretary's policy to treat hospitals as rural when they have "acquired" rural status under 42 C.F.R. § 412.103, there is no public reference to that policy prior to 2006. And even if it had been the Secretary's policy, it had not been longstanding, given that "acquired" rural status was not even available to hospitals until 2001.

98.    In any event, the Secretary has *never* produced any cost analysis that showed that the capital cost structure of "acquired" rural status hospitals is similar to other hospitals physically located in the rural area. Nor could it, since, in fact, these hospitals are urban hospitals and obtaining rural status does not change a hospital's cost.

99.    The Secretary's policy also conflicts with his policy statements articulated just the year before. As noted above, one of the payment adjustments created by Congress as part of the operating cost payment system relates to payments for the indirect costs of graduate medical education.

100.    Congress also created a separate payment adjustment for direct graduate medical education, which is codified at 42 U.S.C. § 1395ww(h).

101.    Rural status under that statute has certain favorable aspects, specifically relating to the number of full-time equivalent residents ("FTEs") which are reimbursable to the hospital. 42 U.S.C. § 1395ww(h)(4)(F)(i) (the limits on reimbursable FTEs is often referred to as the "FTE cap").

102.    The Secretary addressed the *inapplicability* of "acquired" rural status to direct graduate medical education by stating:

> A hospital's reclassification as located in a rural area under this provision affects only payments under section 1886(d) of the Act. Accordingly, a hospital that is treated as rural under this provision can receive the FTE cap adjustments that any other rural hospital receives, but only to the FTE cap that applies for purposes of IME payments, which are made under section 1886(d) of the Act. The hospital could not receive adjustments to its direct GME FTE cap because payments for direct GME are made under section 1886(h) of the Act and <u>the section 1886(d)(8)(E) reclassifications affect only the payments that are made under that section 1886(d) of the Act</u>. Therefore, a hospital that reclassifies as rural under section 1886(d)(8)(E) of the Act may receive the 130-percent adjustment to its IME FTE cap and its IME FTE cap may be adjusted for any new programs, similar to hospitals that are actually located in a rural location.

70 Fed. Reg. 47278, 47437 (Aug. 12, 2005) (emphasis added).

103.    The Secretary demonstrated a similar understanding of the separateness of the operating and capital payment system in his 2007 rulemaking.  In that rulemaking, the Secretary reiterated his belief that he has "broad authority" to establish and implement the capital cost payment system. 72 Fed. Reg. 47130, 47392 (Aug. 22, 2007).  He also acknowledged that Congress set forth "broad governing principles" for this payment system, and that any modifications to this payment system must remain "within those principles."  *Id*. at 47398. Chief among such principles is that the capital cost payment system must ensure that "standard payment rates . . . reflect the costs that an average, efficient provider would bear to provide the services required for quality patient care."  *Id*. at 47394.

104.    On that basis, the Secretary determined that the margins between payment and capital cost had increased, and therefore it chose to recalibrate payment to better reflect actual costs, including the removal of certain adjustments altogether.  *Id.* at 47395-96.

105.    Of particular relevance here, the Secretary rebuffed requests from some hospitals seeking that the Secretary look at total operating and capital costs together when determining hospitals' margins.

106.    The Secretary stated that "we believe that it is appropriate under the current design of the capital and operating IPPSs to base proposals for payment policies under the capital IPPS on analysis that is confined to the data regarding the capital IPPS alone." *Id.* at 47399.  In other words, the Secretary again reiterated that operating cost payment policies and cost data should only affect the operating prospective payment system, and the capital prospective payment system should reflect capital cost data standing alone.

### G.    Impact of Dual Reclassifications

107.    In 2016, the Secretary changed his rules regarding which hospitals could undergo an MGCRB reclassification. 81 Fed. Reg. 23428, 23433-34 (April 21, 2016).

108.    Previously, the Secretary had stated that "acquired" rural status hospitals could not undergo an MGCRB reclassification. The Secretary justified this rule on the policy reason that hospitals asserting that urban status puts them at a disadvantage should not be able to then claim that the disadvantages of rural status entitle them to reclassify. 65 Fed. Reg. 47054, 47088 (Aug. 1, 2000).

109.    The Secretary then lost two cases in the Second Circuit and Third Circuit where the courts, in analyzing the phrase "for purposes of this subsection" within 42 U.S.C. § 1395ww(d)(8)(E), held that this phrase has a plain and explicit meaning. *Geisinger Cmty. Med. Center v. Sec'y, United States Dept. of Health and Human Svcs.*, 794 F.3d 383 (3d Cir. 2015), *Lawrence + Memorial Hospital v. Burwell*, No. 15–164, 2016 WL 423702 (2d Cir. Feb. 4, 2015).   Since § 1886(d)(10) (pertaining to reclassifications) is in § 1886(d), then an "acquired" rural status hospital can use that status accordingly. In other words, these courts did not allow the Secretary to use his policy considerations to supersede the plain meaning of the applicable statute.

110.    The Secretary ultimately relented and acquiesced in those holdings by finally allowing hospitals to undergo dual reclassifications. 81 Fed. Reg. at 23433-34.

**H.      The Secretary's "Substantive Claim" Requirement**

111.    Separate and apart from the substantive issues pertaining to the Secretary's capital DSH regulation, at issue for Plaintiff St. Barnabas Hospital is a procedural regulation relating to Medicare cost report submissions.  The Board held that St. Barnabas did not include in its cost report "an appropriate claim for a specific item" as required under 42 C.F.R § 413.24(j)(1).

112.    42 C.F.R. § 413.24(j) requires hospitals, as a predicate to seeking payment, either to: (a) claim a particular item on their cost report; or (b) if a hospital believes that Medicare policies do not currently allow payment for the item, then it must protest that policy by submitting a "self-disallowance" that identifies the issue and why it believes payment may not be allowed, and estimates the amount at issue.  *See also* 42 C.F.R. § 405.1873 (requiring the Board to determine whether the requirements of 42 C.F.R. § 413.24(j) have been met before granting any relief to a hospital appealing a particular item to the Board).

113.    This "substantive claim" policy is the latest iteration in a series of failed attempts by the Medicare program to cut off a hospital's rights to challenge Medicare policies by imposing superfluous administrative hurdles.  Specifically, courts have held that hospitals do not need to protest a regulation on their cost reports as a predicate to going to court, where such a protest would be futile.

114.    The seminal case in this regard is *Bethesda*.  *Bethesda Hosp. Ass'n v. Bowen*, 485 U.S. 399 (1988).  In that case, the Supreme Court considered whether the Secretary could require hospitals to protest an item on their cost report to demonstrate that they are "dissatisfied" with their total reimbursement, as required by 42 U.S.C. § 1395oo(a)(1)(A)(i).  *Id.* at 402.  Noting that CMS's "strained" interpretation "is inconsistent with the express language of the statute," the Court determined that CMS could not create such a rule where protesting would be futile.  *Id.* at 404.  Such is the case when the hospital is challenging a regulation.

24

115.    The Court found further support for its interpretation of the plain meaning of the statute in 42 U.S.C. § 1395oo(f)(1), which delegates exclusively to the Board the right to decide if a matter is reviewable by the Board.  *Id*. at 406.  Neither the Board nor the Medicare contractor can disregard a CMS regulation, but only the Board can decide whether in fact a hospital is seeking to challenge a regulation, such that the challenge is beyond the Board's authority.  Submitting such a matter to a Medicare contractor is therefore entirely superfluous because the Board will render such a decision upon the development of a record.  The fact that the statute creates a whole process for the Board to follow makes it all the more unlikely that it was the legislative intent to also allow Medicare contractors to make impromptu decisions on their own.  *Id*. at 407.

116.    The Secretary responded to the Supreme Court's decision by creating a regulation.  In 2008, the Secretary promulgated a regulation that required hospitals to protest a regulation on their cost reports in order to establish the jurisdiction to challenge it.  42 C.F.R. § 405.1835(a)(1)(ii) (2008 version).  Although the Supreme Court prohibited such a requirement, the Secretary found support in some dicta in the decision, which stated "[n]o statute *or regulation* expressly mandates that a challenge to the validity of the regulation be submitted to the fiscal intermediary."  *Bethesda*, 485 U.S. at 404 (emphasis added).  The Secretary understood this snippet to mean that the outcome of the case would have been different if only he had a regulation in place requiring hospitals to protest regulations in their cost reports.

117.    A subsequent court decision, however, proved the Secretary wrong.  In *Banner*, the District Court for the District of Columbia considered whether the Secretary's 2008 regulation was consistent with the holding in *Bethesda* and concluded that it is not.  *Banner Heart Hospital v. Burwell*, 201 F.Supp. 3d 131, 140 (D.D.C. 2016).  The court interpreted the Supreme Court's decision in *Bethesda* as providing an unqualified right to hospitals under 42 U.S.C. § 1395oo to

appeal without prior protest whenever presenting a claim to the Medicare contractor would be futile. *Id*. Thus, under Step One of the oft-cited *Chevron* test, the court held that the Secretary has no right to promulgate a contrary regulation. *Id*. at 142.

118.    The Secretary's agency, CMS, ultimately acquiesced in this holding and issued a ruling that waived the application of its 2008 regulation to hospital challenges. CMS-1727-R (Apr. 23, 2018).

119.    Nevertheless, even before the *Banner* decision was issued, the Secretary had already revised the protest requirement again. This time, the protested item requirements have been transferred from the section of the regulations regarding Board jurisdiction to the section pertaining to cost report claim requirements. 80 Fed. Reg. at 70563. The Federal Register preamble explaining this regulation does not clearly identify the purpose of the transfer. However, it cites new statutory support for the policy, which are all general payment statutes that allow the agency to create cost report and claims submission rules. *Id*. at 70556 (citing to Sections 1815(a), 1833(e), and 1886(f)(1) of the Social Security Act). The Secretary, however, does not explain why these general claims submission authorities should be viewed as superseding the express appeals authority in 42 U.S.C. § 1395oo, as interpreted by the Supreme Court.

## VI.    FACTUAL BACKGROUND

### A.    Sanford Bismarck Medical Center

120.    Plaintiff hospital Sanford Bismarck Medical Center is a safety net hospital physically located in Bismarck, North Dakota.

121.    Bismarck makes up its own metropolitan statistical area ("MSA") and thus qualifies as an "urban area" for Medicare payment purposes.

122.    Thus, plaintiff hospital Sanford Bismarck Medical Center is physically located in an urban area.

123.    Plaintiff hospital Sanford Bismarck Medical Center underwent a rural reclassification with an effective date of September 21, 2012 by application to CMS. Therefore, although it remained physically in the Bismarck MSA, it was considered to be in the rural area of North Dakota as of that date.

124.    Plaintiff hospital Sanford Bismarck Medical Center, up through the present, has not received any capital DSH payments subsequent to acquiring rural status.

**B.    Sanford Medical Center – Fargo**

125.    Plaintiff hospital Sanford Medical Center – Fargo is a safety net hospital physically located Fargo, North Dakota.

126.    Fargo makes up its own MSA and thus qualifies as an "urban area" for Medicare payment purposes.

127.    Thus, plaintiff hospital Sanford Medical Center – Fargo is physically located in an urban area.

128.    Plaintiff hospital Sanford Medical Center – Fargo underwent a rural reclassification with an effective date of April 20, 2012 by application to CMS. Therefore, although it remained physically in the Fargo MSA, it was considered to be in the rural area of North Dakota as of that date.

129.    Plaintiff hospital Sanford Medical Center – Fargo, up through the present, has not received any capital DSH payments subsequent to acquiring rural status.

**C.    Strong Memorial Hospital**

130.    Plaintiff hospital Strong Memorial Hospital is a safety net hospital physically located in Rochester, New York.

131.    Rochester makes up its own MSA and thus qualifies as an "urban area" for Medicare payment purposes.

132.    Thus, plaintiff hospital Strong Memorial Hospital is physically located in an urban area.

133.    Plaintiff hospital Strong Memorial Hospital underwent a rural reclassification with an effective date of April 18, 2016 by application to CMS. Therefore, although it remained physically located in the Rochester MSA, it was considered to be in the rural area of New York as of that date.

134.    Plaintiff hospital Strong Memorial Hospital, up through the present, has not received any capital DSH payments subsequent to acquiring rural status.

**D.    Highland Hospital**

135.    Plaintiff hospital Highland Hospital is a safety net hospital physically located in Rochester, New York.

136.    Rochester makes up its own MSA and thus qualifies as an "urban area" for Medicare payment purposes.

137.    Thus, plaintiff hospital Highland Hospital is physically located in an urban area.

138.    Plaintiff hospital Highland Hospital underwent a rural reclassification with an effective date of April 27, 2016 by application to CMS. Therefore, although it remained physically located in the Rochester MSA, it was considered to be in the rural area of New York as of that date.

139.    Plaintiff hospital Highland Hospital, up through the present, has not received any capital DSH payments subsequent to acquiring rural status.

**E.    Glens Falls Hospital**

140.    Plaintiff hospital Glens Falls Hospital is a safety net hospital physically located in Glens Falls, New York.

141.    Glens Falls makes up its own MSA and thus qualifies as an "urban area" for Medicare payment purposes.

142.    Thus, plaintiff hospital Glens Falls Hospital is physically located in an urban area.

143.    Plaintiff hospital Glens Falls Hospital underwent a rural reclassification with an effective date of August 30, 2016 by application to CMS. Therefore, although it remained physically located in the Glens Falls MSA, it was considered to be in the rural area of New York as of that date.

144.    Plaintiff hospital Glens Falls Hospital, up through the present, has not received any capital DSH payments subsequent to acquiring rural status.

**F.    Saratoga Hospital**

145.    Plaintiff hospital Saratoga Hospital is a safety net hospital physically located in Saratoga Springs, New York.

146.    Saratoga Springs is a part of the Albany-Schenectady-Troy MSA and thus qualifies as an "urban area" for Medicare payment purposes.

147.    Thus, plaintiff hospital Saratoga Hospital is physically located in an urban area.

148.    Plaintiff hospital Saratoga Hospital underwent rural reclassification with an effective date of August 30, 2016 by application to CMS. Therefore, although it remained physically located in the Albany-Schenectady-Troy MSA, it was considered to be in the rural area of New York as of that date.

149.    Plaintiff hospital Saratoga Hospital, up through the present, has not received any capital DSH payments subsequent to acquiring rural status.

**G.    South Texas Healthcare System**

150.    Plaintiff hospital South Texas Healthcare System is a safety net hospital physically located in Edinburg, Texas.

151.    Edinburg is a part of the McAllen-Edinburg-Mission MSA and thus qualifies as an "urban area" for Medicare payment purposes.

152.    Thus, plaintiff hospital South Texas Healthcare System is physically located in an urban area.

153.    Plaintiff hospital South Texas Healthcare System underwent rural reclassification with an effective date of August 30, 2016 by application to CMS. Therefore, although it remained physically located in the McAllen-Edinburg-Mission MSA, it was considered to be in the rural area of Texas as of that date.

154.    Plaintiff hospital South Texas Healthcare System, up through the present, has not received any capital DSH payments subsequent to acquiring rural status.

**H.    Northwest Texas Healthcare System**

155.    Plaintiff hospital Northwest Texas Healthcare System is a safety net hospital physically located in Amarillo, Texas.

156.    Amarillo makes up its own MSA and thus qualifies as an "urban area" for Medicare payment purposes.

157.    Thus, plaintiff hospital Northwest Texas Healthcare System is physically located in an urban area.

158.    Plaintiff hospital Northwest Texas Healthcare System underwent rural reclassification with an effective date of August 30, 2016 by application to CMS. Therefore, although it remained physically located in the Amarillo MSA, it was considered to be in the rural area of Texas as of that date.

159.    Plaintiff hospital Northwest Texas Healthcare System, up through the present, has not received any capital DSH payments subsequent to acquiring rural status.

**I.    St. Barnabas Hospital**

160.    Plaintiff hospital St. Barnabas Hospital is a safety net hospital physically located in the Bronx, New York.

161.    The Bronx is part of the New York-Newark-Jersey City, NY-NJ-PA MSA and thus qualifies as an "urban area" for Medicare payment purposes.

162.    Thus, plaintiff hospital St. Barnabas Hospital is physically located in an urban area.

163.    Plaintiff hospital St. Barnabas Hospital underwent rural reclassification with an effective date of October 4, 2017 by application to CMS. Therefore, although it remained physically located in the New York-Newark-Jersey City, NY-NJ-PA MSA, it was considered to be in the rural area of New York as of that date.

164.    Plaintiff hospital St. Barnabas Hospital, up through the present, has not received any capital DSH payments subsequent to acquiring rural status.

**J.    Toledo Hospital**

165.    Plaintiff hospital Toledo Hospital is a safety net hospital physically located in Toledo, Ohio.

166.    Toledo makes up its own MSA and thus qualifies as an "urban area" for Medicare payment purposes.

167.    Thus, plaintiff hospital Toledo Hospital is physically located in an urban area.

168.    Plaintiff hospital Toledo Hospital underwent rural reclassification with an effective date of September 1, 2016 by application to CMS. Therefore, although it remained physically located in the Toledo MSA, it was considered to be in the rural area of Ohio as of that date.

169.    Plaintiff hospital Toledo Hospital, up through the present, has not received any capital DSH payments subsequent to acquiring rural status.

**K.    Cape Fear Valley Medical Center**

170.    Plaintiff hospital Cape Fear Valley Medical Center is a safety net hospital physically located in Fayetteville, North Carolina.

171.    Fayetteville makes up its own MSA and thus qualifies as an "urban area" for Medicare payment purposes.

172.    Thus, plaintiff hospital Cape Fear Valley Medical Center is physically located in an urban area.

173.    Plaintiff hospital Cape Fear Valley Medical Center underwent rural reclassification with an effective date of August 18, 2016 by application to CMS. Therefore, although it remained physically located in the Fayetteville MSA, it was to be considered in the rural area of North Carolina as of that date.

174.    Plaintiff hospital Cape Fear Valley Medical Center, up through the present, has not received any capital DSH payments subsequent to acquiring rural status.

**L.    Geisinger Wyoming Valley Medical Center**

175.    Plaintiff hospital Geisinger Wyoming Valley Medical Center is a safety net hospital physically located in Wilkes-Barre, Pennsylvania.

176.    Wilkes-Barre, Pennsylvania is part of the Scranton-Wilkes-Barre MSA and thus qualifies as an "urban area" for Medicare payment purposes.

177.    Thus, plaintiff hospital Geisinger Wyoming Valley Medical Center is physically located in an urban area.

178.    Plaintiff hospital Geisinger Wyoming Valley Medical Center underwent rural reclassification with an effective date of June 5, 2017 by application to CMS. Therefore, although it remained physically located in the Scranton-Wilkes-Barre MSA, it was considered to be in the rural area of Pennsylvania as of that date.

179.    Plaintiff hospital Geisinger Wyoming Valley Medical Center, up through the present, has not received any capital DSH payments subsequent to acquiring rural status.

**M.    Geisinger – Community Medical Center**

180.    Plaintiff hospital Geisinger – Community Medical Center is a safety net hospital physically located in Scranton, Pennsylvania.

181.    Scranton is part of the Scranton-Wilkes-Barre MSA and thus qualifies as an "urban area" for Medicare payment purposes.

182.    Thus, plaintiff hospital Geisinger – Community Medical Center is physically located in an urban area.

183.    Plaintiff hospital Geisinger – Community Medical Center underwent rural reclassification with an effective date of May 5, 2016 by application to CMS. Therefore, although it remained physically located in the Scranton-Wilkes-Barre MSA, it was considered to be in the rural area of Pennsylvania as of that date.

184.    Plaintiff hospital Geisinger – Community Medical Center, up through the present, has not received any capital DSH payments subsequent to acquiring rural status.

**N.    Albany Medical Center**

185.    Plaintiff hospital Albany Medical Center is a safety net hospital physically located in Albany, New York.

186.    Albany is part of the Albany-Schenectady-Troy MSA and thus qualifies as an "urban area" for Medicare payment purposes.

187.    Thus, plaintiff hospital Albany Medical Center is physically located in an urban area.

188.    Plaintiff hospital Albany Medical Center underwent rural reclassification with an effective date of October 3, 2018 by application to CMS. Therefore, although it remained physically located in the Albany-Schenectady-Troy MSA, it was considered to be in the rural area of New York as of that date.

189.    Plaintiff hospital Albany Medical Center, up through the present, has not received any capital DSH payments subsequent to acquiring rural status.

**O.     Lake Charles Memorial Hospital**

190.    Plaintiff hospital Lake Charles Memorial Hospital is a safety net hospital physically located in Lake Charles, Louisiana.

191.    Lake Charles makes up its own MSA and thus qualifies as an "urban area" for Medicare payment purposes.

192.    Thus, plaintiff hospital Lake Charles Memorial Hospital is physically located in an urban area.

193.    Plaintiff hospital Lake Charles Memorial Hospital underwent a rural reclassification with an effective date of December 20, 2016 by application to CMS. Therefore, although it remained physically located in the Lake Charles MSA, it was considered to be in the rural area of Louisiana as of that date.

194.    Plaintiff hospital Lake Charles Memorial Hospital, up through the present, has not received any capital DSH payments subsequent to acquiring rural status.

**P.     Montefiore Medical Center**

195.    Plaintiff hospital Montefiore Medical Center is a safety net hospital physically located in the Bronx, New York.

196.    The Bronx is part of the New York-Newark-Jersey City, NY-NJ-PA MSA and thus qualifies as an "urban area" for Medicare payment purposes.

197.    Thus, plaintiff hospital Montefiore Medical Center is physically located in an urban area.

198.    Plaintiff hospital Montefiore Medical Center underwent rural reclassification with an effective date of September 14, 2016 by application to CMS. Therefore, although it remained physically located in the New York-Newark-Jersey City, NY-NJ-PA MSA, it was considered to be in the rural area of New York as of that date.

199.    Plaintiff hospital Montefiore Medical Center, up through the present, has not received any capital DSH payments subsequent to acquiring rural status.

**Q.    Montefiore New Rochelle Hospital**

200.    Plaintiff hospital Montefiore New Rochelle Hospital is a safety net hospital physically located in New Rochelle, New York.

201.    Montefiore New Rochelle Hospital is part of the New York-Newark-Jersey City, NY-NJ-PA MSA and thus qualifies as an "urban area" for Medicare payment purposes.

202.    Thus, plaintiff hospital Montefiore New Rochelle Hospital is physically located in an urban area.

203.    Plaintiff hospital Montefiore New Rochelle Hospital underwent rural reclassification with an effective date of October 4, 2017 by application to CMS. Therefore, although it remained physically located in the New York-Newark-Jersey City, NY-NJ-PA MSA, it was considered to be in the rural area of New York as of that date.

204.    Plaintiff hospital Montefiore New Rochelle Hospital, up through the present, has not received any capital DSH payments subsequent to acquiring rural status.

**R.    White Plains Hospital Medical Center**

205.    Plaintiff hospital White Plains Hospital Medical Center is a safety net hospital physically located in White Plains, New York.

206.    White Plains is part of the New York-Newark-Jersey City, NY-NJ-PA MSA and thus qualifies as an "urban area" for Medicare payment purposes.

207.    Thus, plaintiff hospital White Plains Hospital Medical center is physically located in an urban area.

208.    Plaintiff hospital White Plains Hospital Medical Center underwent rural reclassification with an effective date of October 4, 2017 by application to CMS. Therefore, although it remained

physically located in the New York-Newark-Jersey City, NY-NJ-PA MSA, it was considered to be in the rural area of New York as of that date.

209.    Plaintiff hospital White Plains Hospital Medical Center, up through the present, has not received any capital DSH payments subsequent to acquiring rural status.

## VII.    THE SECRETARY'S CAPITAL DSH REGULATION IS INVALID BECAUSE IT DOES NOT COMPORT WITH THE UNDERLYING STATUTE OR BINDING CASE LAW

210.    42 U.S.C. § 1395ww(d)(8)(E) does not, standing alone, give CMS the right to treat hospitals with "acquired" rural status as rural for capital DSH purposes. This section expressly applies only to subsection (d).

211.    The Secretary has previously acknowledged this fact in the context of direct graduate medical education payments, as described above.

212.    The Secretary must adhere to the plain meaning of Subsection (d), as he has been instructed by the courts.

   a)    The Secretary must also adhere to the plain meaning of Subsection (g), which requires that its capital cost prospective payment system be tied to a hospital's capital costs. And specific to any payment adjustments, such as capital DSH, the Secretary must "take into account variations in the relative costs of capital." 42 U.S.C. § 1395ww(g)(1)(B)(ii).

213.    The Secretary himself acknowledges that, though his authority is broad, he still must adhere to the "broad governing principles," which first and foremost requires that the payment system relate to cost.   72 Fed. Reg. at 47398.  The statute allows the Secretary discretion in three specific instances: 1) to adjust for relative costs of capital and construction for different types of facilities or areas in which they are located; 2) for exceptions generally related to capital obligations; and 3) adjustments to reflect hospital occupancy rate. None of these discretionary exceptions, as drafted or as implemented, relate to "acquired" rural status. Rather, they all relate to potentially

unique cost circumstances, and the Secretary has implemented several of these exceptions accordingly when it has found a cost-based reason to do so.

214.    The Secretary originally interpreted the statute by conducting an analysis of the capital costs various providers actually incurred and used this as a basis to formulate the system. He developed the concept of capital DSH because his analysis showed that it was a faithful proxy for reflecting the capital costs of safety net hospitals treating low income patients. 56 Fed. Reg. 43378-79. This original interpretation of the statute was consistent with the statute's plain meaning.

215.    In 2006, the Secretary offered two principal justifications for newly promulgating a regulation denying capital DSH to hospitals with acquired rural status.  *First*, the Secretary claimed that it was "historic policy" to consider these hospitals as rural under the capital prospective payment system.  And *second*, more broadly, the Secretary stated that, since the inception of its capital prospective payment system, it has always used the same geographic classifications for its capital and operating payment systems.  However, upon close review in court, neither statement has proven accurate.

216.    In *Toledo Hospital v. Becerra*, No 19-cv-3820 (DLF), 2021 WL 4502052, at *12 (D.D.C. Sept. 30, 2021), Toledo Hospital challenged the MAC's decision to deny the Capital DSH reimbursement from the effective date of its rural reclassification.  *Toledo Hospital*, 2021 WL 4502052 at *5.  Toledo Hospital contended that 42 C.F.R. § 412.320(a)(1)(iii) was arbitrary and capricious because the rule failed to "take into account" relative costs of capital, as required by Section 1886(g).  *Toledo Hospital*, 2021 WL 4502052 at *8.  The court agreed, acknowledging that Section 1886(g) "requires the Secretary to 'take into account' variations in relative capital costs."  *Toledo Hospital*, 2021 WL 4502052 at *7.

217.    In reaching its decision, the court considered whether in fact the Secretary had the "historic policy" of treating hospitals with acquired rural status as rural for capital payment purposes, as professed in his rulemaking.  The court concluded, however, that he did not.  Notably, the Secretary conceded that "he 'did not address through rulemaking whether [rural reclassified] hospitals were eligible for Capital DSH until 2006.'"  *Id.* at *9.  As the sole support for the supposed historic policy, the Secretary relied on some errant cross-references between some of his regulations that changed over time.   The Court explained, however, that to the extent the cross-references established such a policy, a rulemaking in 2004 "removed the § 412.63(a) cross-reference entirely, thereby eliminating any link between the capital DSH adjustments" and status as a rural reclassified hospital.  *Toledo Hospital*, 2021 WL 4502052 at *9.

218.    The court also addressed whether there had been a steadfast rule to treat geographic classifications the same between the operating and capital payment systems.  There as well, the court did not find support for the statements in the Secretary's rulemaking.  Rather, according to the court, no regulation "explicitly stated that the [rural] reclassification scheme was tied to capital DSH adjustments, or that classifications under the two schemes [operating and capital PPS] were uniform."  *Id.* at *10.  Rather, a review of the regulatory history "reveal[ed] that the agency was concerned more with cost correlation between the operating and capital PPS, rather than classification consistency."  *Id.* at *11.

219.    The agency's "actual practice" was likewise unsupportive of the Secretary's position, with the court noting that "[a]t least one . . . reclassified rural hospital that requested the capital DSH adjustment received an adjustment."  *Id.*  In other words, in stark contrast with statements made by the Secretary in the Federal Register, the court found that the Secretary had neither the policy nor the practice of denying capital DSH to hospitals with acquired rural status.

220.    Without such support, the Court examined whether there was any other evidence that in fact the Secretary considered "the relative costs of capital for hospitals, like Toledo Hospital, that had reclassified as rural . . . but are physically located in an urban area." *Id.*  The record was absent of any evidence "that the agency took these costs into account, either in 1991, 2000, 2004, or 2006." *Id.* at \*12.  This failure was inconsistent with the statute, which instructs the Secretary that he "must take relative costs 'into account' to some degree in determining adjustments to the capital PPS system." *Id.*

221.    Accordingly, the Court held that the 2006 rulemaking that promulgated 42 C.F.R. § 412.320(a)(1)(iii) "was arbitrary and capricious.  Thus, [42 C.F.R. § 412.320(a)(1)(iii)] is unreasonable and cannot be relied upon to deny . . . the capital DSH adjustment." *Id.*

222.    Despite concluding that 42 C.F.R. § 412.320(a)(1)(iii) is arbitrary and capricious, the Court did not vacate the rule.  *Id.*  The Court explained that it could not vacate the rule because Toledo Hospital "[could] not directly challenge the rule under the APA because the six-year statute of limitations [had] lapsed." *Id.*  Instead, it could only "'hold unlawful and set aside [the] agency action' that [was] unlawful," i.e., the application of the regulation to the plaintiff.

223.    The Defendant initially filed a notice of appeal in the *Toledo Hospital* case on November 29, 2021.  However, he ultimately relented and withdrew his appeal on December 30, 2021.  The *Toledo Hospital* is therefore the final, binding decision that directly determines the outcome of this matter as well.

224.    For all the same reasons that the *Toledo Hospital* court set aside the regulation as applied to the plaintiff in that case, so, too, here, the Court should set aside the regulation and instruct the Secretary to pay the Plaintiffs their capital DSH.

**VIII.** **THE SECRETARY'S RELIEF PRECLUSION REGULATION ALSO VIOLATES THE GOVERNING STATUTE AND IS OTHERWISE INEQUITABLE, AS APPLIED HERE**

225.    As to St. Barnabas, the Secretary's actions violate 42 U.S.C. § 1395oo.  As held in *Bethesda*, this statute gives hospitals an unqualified right to appeal an item to Federal court, and receive relief therefrom, even without a cost report protested item, where such protest would be futile.  *Bethesda*, 485 U.S. at 404.

226.    To the extent that there is any ambiguity in *Bethesda* as to the Secretary's right to supersede the statute with a regulation, the *Banner* case makes it clear that the Secretary possesses no such right.  *Banner*, 201 F. Supp. 3d at 142.  The Secretary cannot override the statute's plain meaning.

227.    While there are general authorities that allow the Secretary to set out claims processing rules, those authorities do not supersede the specific appeals authority in 42 U.S.C. § 1395oo.  Instead, they address the right for the Secretary to establish claims processing rules for claims *he intends to pay*.

228.    It is also inequitable for the Secretary to avoid making payment where the reason hospitals like St. Barnabas were unaware of the invalidity of the capital DSH policy was due to the Secretary's own misstatements.  The Secretary could not, even after multiple rounds of briefing in the *Toledo Hospital* case, cogently explain the support for his statements in the 2006 Federal Register preamble.  The genuineness of those statements is therefore called into question.  Courts recognize that agencies should not benefit from a lack of transparency.  *See, e.g.*, *Bowen v. City of New York*, 476 U.S. 467, 481 (1986) (stating that "[w]here the Government's secretive conduct prevents plaintiffs from knowing of a violation of rights," equitable remedies such as tolling of the statute of limitations should apply).  At a minimum, the Court should interpret 42 C.F.R. § 413.24(j) as having an implicit exception for agency errors that are unknown to, and not otherwise reasonably knowable by, a hospital.

## IX.    <u>STANDARD OF REVIEW AND ASSIGNMENTS OF ERROR</u>

229.    42 U.S.C. § 1395oo(f) provides for review of the Board's decisions below and the Secretary's promulgation of the regulation at issue pursuant to the applicable provisions of the APA. The applicable provisions of the APA require a reviewing court to set aside agency action that is found to be contrary to law, arbitrary, capricious, unsupported by substantial evidence, in excess of statutory authority or otherwise not in accordance with law. 5 U.S.C. § 706.

230.    This Court has jurisdiction to decide the validity of the Secretary's regulation pursuant to 42 U.S.C. § 1395oo(f)(1) because the Board determined that it lacks the authority to decide the validity of the regulation at issue. *See Allina Health Servs. v. Price*, 863 F.3d 937, 941 (D.C. Cir. 2017) (noting that the Board's granting of expedited judicial review cannot be questioned by Federal courts) (affirmed on other grounds in 139 S.Ct. 1804 (Jun 03, 2019)).

231.    Medicare's regulation at 42 C.F.R. § 412.320(a)(1)(iii) automatically categorizing acquired rural status hospitals as rural for purposes of the capital DSH adjustment is contrary to the plain meaning of the Medicare Act (specifically 42 U.S.C. § 1395ww(g)(1)(B)(ii)), is arbitrary and capricious, is not supported by substantial evidence, and is in excess of the Secretary's statutory authority. *See* 5 U.S.C. §§ 706(2)(A), (C), and (E); *see also Toledo Hospital*, at *12.

232.    Medicare's regulations at 42 C.F.R. §§ 413.24(j) and 405.1873 denying hospitals the opportunity for relief in court where they did not provide a futile notice to their Medicare contractor regarding a challenge to a regulation is equally contrary to the plain meaning of the Medicare Act (specifically 42 U.S.C. § 1395oo), is arbitrary and capricious, is not supported by substantial evidence and is in excess of the Secretary's authority.  *See* 5 U.S.C. §§ 706(2)(A), (C), and (E).

## X.    <u>RELIEF REQUESTED</u>

For the foregoing reasons, the Plaintiffs respectfully request that this Court issue:

a) A declaration that 42 C.F.R. § 412.320(a)(1)(iii) is unlawful and must be vacated or, in the alternative, set it aside as it relates to the Plaintiffs;

b) A declaration that the Plaintiffs are physically located in urban areas and therefore qualify for capital DSH payments, notwithstanding their acquired rural status;

c) An order requiring the Medicare program to pay to Plaintiffs, with interest, all sums associated with the capital DSH payments that have been wrongfully withheld;

d) A declaration that 42 C.F.R. §§ 413.24(j) and 405.1873 are unlawful and must be vacated, or in the alternative, not be applied to St. Barnabas in the current matter;

e) Remand this matter to the Board with instructions to recalculate such payment described above, plus interest calculated in accordance with 42 U.S.C. § 1395oo(f)(2); and

f) Grant such other and further relief as the Court deems just and proper.

Respectfully Submitted,

*/s/ Andrew D. Ruskin*
Andrew D. Ruskin
DC Bar No. 475824
K&L GATES LLP
1601 K Street, N.W.
Washington, D.C. 20004
(202) 778-9000 (phone)
(202) 778-9100 (fax)
andrew.ruskin@klgates.com

Counsel for Plaintiffs

Dated: January 13, 2023